IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

*Newport News Division*

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v. ) | Criminal No. 4:24-cr-80 |
| ) | |
| LAKEIA SIMONE SHEPPERD, ) | |
| ) | |
| Defendant. ) | |

POSITION OF UNITED STATES ON SENTENCING

In accordance with 18 U.S.C. § 3553(a) and the United States Sentencing Commission, *Guidelines Manual,* § 6A1.2, the United States of America – through its attorneys, Lindsey Halligan, United States Attorney for the Eastern District of Virginia, and D. Mack Coleman, Assistant United States Attorney – hereby represents that it has reviewed the probation office's presentence report (hereinafter "PSR") and that it does not dispute any of the facts set forth therein. For the reasons to follow, as well as those to be offered during the sentencing hearing, the United States respectfully requests that the Court impose an advisory guideline sentence of 66 months of incarceration.

The defendant – a five-time convicted felon – conspired to file approximately 38 unemployment claims on behalf of inmates during a national pandemic. Time and again, she was recorded on phone calls and messages with these inmates discussing the unemployment claims, the necessary personal information to perpetrate the fraud, and the proceeds of the offenses of conviction. There is no excuse for this behavior. Inmates were plainly ineligible for unemployment because they (i) did not lose their job because of the pandemic and (ii) they were not able and available for work. If this were not enough, this scheme went on for more than a year and required countless actions by the defendant to perpetrate the fraud by lies and false pretenses.

Each time, she chose to continue instead of walking away. These are serious crimes that call for a commensurate sentence of incarceration.

PROCEDURAL HISTORY

On November 12, 2024, a grand jury in Newport News returned a thirteen-count indictment, charging the defendant with conspiracy to commit mail fraud, multiple counts of mail fraud, and aggravated identity theft. (ECF No. 3.) On March 11, 2025, the defendant pleaded guilty to conspiracy to commit mail fraud (count 1) and aggravated identity theft (count 13). (ECF Nos. 20-22.) On April 2, 2025, the Court accepted the plea of guilty. (ECF No. 25.) The instant sentencing was continued by the defendant to December 2, 2025. (ECF Nos. 27-28.)

The defendant's coconspirator, Kendra Hatcher, was previously sentenced by Judge Young to six months of imprisonment and five years of supervised release. (E.D. Va. Case No. 4:24-cr-54.)

OFFENSE OF CONVICTION

The defendant's conviction stems from her involvement in a scheme and artifice to defraud the United States and the Commonwealth of Virginia to obtain pandemic-related unemployment benefits. From in or about May 2020 through in or about at least October 2021, the defendant and her coconspirator, Kendra Hatcher, joined together to execute the scheme and artifice to defraud. (SOF ¶ 23.)

The defendant and Hatcher's roles in the conspiracy and scheme and artifice to defraud were as outside facilitators who filed fraudulent claims with the Virginia Employment Commission for inmates in the custody of the Virginia Department of Corrections and coordinated to obtain, transfer, and expend proceeds. (SOF ¶ 10.)

The defendant and Hatcher conspired with inmate recruiters to obtain the personally identifying information of inmates to file such claims. These recruiters included J.J., D.M., J.T., J.C., and R.D., among others. J.J. was an inmate at Buckingham Correctional Center. D.M. was an inmate at Wallens Ridge State Prison. J.T. was an inmate at Sussex II State Prison. J.C. and R.D. were inmates at Augusta Correctional Center. (SOF ¶ 11.) Between on or about May 10, 2020, and on or about September 7, 2020, the defendant had 330 calls with inmate recruiters J.T. (Sussex II), R.D. (Augusta), Q.B. (Augusta), and D.M. (Wallens Ridge). (SOF ¶ 12.)

There are numerous recorded calls that were representative of contemporaneous communication during the execution of the conspiracy and scheme and artifice to defraud, which all show the defendant playing a significant role. For example, on or about April 21, 2020, and April 26, 2020, the defendant asked for personally identifying information for D.M.'s cellmate. D.M. responded that he had sent it previously. The defendant said she needed mailing addresses for the applicants. (SOF ¶ 13.) On recorded phone calls on or about May 11, 2020, inmate recruiter D.M. provided the defendant with the name, date of birth, social security number, and driver's license for an inmate. D.M. said that he would give the inmate only $400 for the information because he and his cellmate would keep the other $100 for letting the other inmate use his mailing address. (SOF ¶ 14.) On a recorded phone call on or about May 14, 2020, inmate recruiter J.T. and the defendant discussed the application status of three inmates. J.T. discussed unemployment applications with an inmate off the phone. The other inmate asked how much, and the defendant said it is $2,500. The inmate said he wants one-third of the total amount, and the defendant can keep the rest. The inmate then provided his name, inmate number, and birthday. (SOF ¶ 15.) On a recorded phone call on or about May 21, 2020, inmate recruiter R.D.[1] asked the

---

[1] R.D. was convicted after a trial by jury before this Court of use a firearm resulting in death, five counts of violating § 924(c), five counts of Hobbs Act robbery, one count of Hobbs

3

defendant if "every junk" needed an address. The defendant told R.D. that they all need an address, but she could make one up if they don't have an address or she would pay someone to use theirs. (SOF ¶ 16.)  On a recorded phone call on or about May 21, 2020, inmate recruiter J.J. told the defendant he had three names to send her. The defendant asked if they had addresses, and J.J. indicated only one had his own address. The defendant told J.J. that she needed a phone number for "his people," so she could contact them for the card. J.J. said he would send the other applications to an address in Norfolk and that he would send the defendant names and numbers. The defendant asked if he needed middle names, and the defendant said no, but a middle initial would be nice. (SOF ¶ 17.)  On a recorded phone call on or about June 5, 2020, inmate recruiter J.J. asked about an inmate's claim. The defendant said that she was unsure if she had done that claim yet. J.J. told the defendant it was the last one he had sent to the defendant's other JPAY account. The defendant said she had her paperwork back at her house, so she would have to check later. (SOF ¶ 18.)  On recorded phone calls on or about June 10, 2020, and June 17, 2020, inmate recruiter J.T. asked the defendant about three applications. The defendant said she had money for J.T., but she could not send it via Cash App. The defendant indicated she would send the funds by money order. (SOF ¶ 19.)  On a recorded phone call on or about July 12, 2020, inmate recruiter R.D. asked if "them junks" can "go again." The defendant said that the same names cannot apply again, so R.D. said he would send her different ones. (SOF ¶ 20.)

In sum, the inmate recruiters like J.J., D.M., J.T., J.C., and R.D. provided to the defendant and L.S. the personally identifying information of inmates to file fraudulent UI Claims. This resulted in the defendant and Hatcher filing approximately 38 successful UI claims. The total

---

Act robbery conspiracy, and four counts of felon-in-possession. (ED Va. No. 4:24-cr-74.) The underlying criminal case involved R.D. murdering four victims on the Peninsula in the fall of 2017.

4

fraud loss for the inmate claims was $492,836.76. (PSR ¶ 8.) The defendant and others known and unknown also applied for at least four successful UI claims for non-inmates. This resulted in additional actual fraud loss of approximately $107,670. (SOF ¶ 22.) The total fraud loss for the entire scheme was approximately $600,597.00. (PSR ¶ 8.)

THE DEFENDANT'S BACKGROUND

The defendant is a 39-year-old female who currently resides in Newport News.

The defendant has a significant criminal record. In November 2005, she was convicted of obstruction of justice and petit larceny in Newport News Circuit Court. (PSR ¶ 40.) She was caught by loss prevention shoplifting from Value City. Troublingly, she made a bad decision worse by attempting to hit the loss prevention officer and threatening to burn down the business and blow it up. (PSR ¶ 40.) In July 2008, she was convicted of unlawful wounding for attacking a victim at a night club with an unknown object that was used to hit the victim in the head. (PSR ¶ 41.) In April 2010, she was convicted in Chesterfield Circuit Court for conspiring to obtain money by false pretense and obtaining money by false pretense. (PSR ¶ 43.) In October 2014, she was again convicted in Chesterfield Circuit Court for obtaining money by false pretense. (PSR ¶ 45.) In April 2019, she was convicted for conspiring to commit financial card fraud in Wake County District Court in Raleigh, North Carolina. (PSR ¶ 46.) Finally, in December 2019, she was convicted for failing to return a rental car from Enterprise. (PSR ¶ 47.) The defendant also had at least 11 other arrests for forgery, destruction of property, failure to return rental property, obtaining money by false pretenses, harassment by computer, failing to appear, violating a protective order, and other offenses. (PSR ¶ 54-64.) In total, her criminal history score was five and her category was III. (PSR ¶ 49, 51.)

The defendant reported some details about her early life to Probation, but there appears to have been some irregularities in this process. For example, she declined to provide the age that her parents separated and told Probation that "she only knows things about herself." (PSR ¶ 65.) And she reported having been sexually assaulted as a juvenile, but was unable to provide any details about the incident for Probation to verify the account. (PSR ¶ 66.)

According to the defendant, she was born to a non-marital union and was provided more than the basic necessities. (PSR ¶ 65.) As an adult, she is married to a Jamaican man, and they have three children. (PSR ¶ 70.) While on pretrial release, the defendant has been living with her stepbrother in Newport News. (PSR ¶ 71.) The defendant is in good health with minor medical conditions managed by medication, has no history of mental health issues, and no documented issues with substance abuse. (PSR ¶ 73-75.) She graduated from high school and completed some college. (PSR ¶ 77-78.) She is self-employed as the owner of Such A Lady Boutique, which she reports is a business that sells clothes, hair, and hair products. (PSR ¶ 79.)

## DISCUSSION

The Court's analysis should begin with a proper guideline range calculation, which reflects the fact that the United States Sentencing Commission, as instructed by Congress, crafted guidelines which incorporate the Section 3553(a) factors. *See United States v. Johnson*, 445 F.3d 339, 342-43 (4th Cir. 2006). The United States recognizes that a sentencing court may not presume that a sentence within the advisory guideline range is reasonable; however, the guidelines remain a significant and pivotal component of the sentencing process. The Court "must first calculate the Guidelines range, and then consider what sentence is appropriate for the individual defendant in light of the statutory sentencing factors, 18 U.S.C. § 3553(a), explaining any variance from the former with reference to the latter." *Nelson v. United States*, 129 S. Ct. 890, 891-92 (2009). Title

18, United States Code, Section 3553(a)(1) provides that, in determining a sentence, courts must consider the nature and circumstances of the offense, as well as the history and characteristics of the defendant. The United States respectfully requests that the Court impose an advisory guideline sentence of 66 months, which constitutes 42 months on Count 1 and 24 mandatory, consecutive months on Count 13. Such a sentence is warranted to account for the aggravating factors surrounding the defendant's fraud. She took advantage of benefits made available for those impacted by the pandemic during a period when the government was trying to quickly make benefits available to those of us hardest hit by COVID-19.

*First*, the nature and circumstances of the offense are serious. The Sentencing Commission determined, through empirical studies, that the sentences of "'white collar' crimes, such as embezzlement, fraud and tax evasion, were considerably lower than those for the substantially equivalent crime of larceny." "In light of the legislative history supporting higher sentences for white-collar crime (S. Rep. No. 225, 98th Cong., 1st Sess., 177 (1983)), the Commission made a policy decision to adopt a guideline structure under which all of these crimes are treated essentially identically." United States Sentencing Commission, Supplemental Report on the Initial Sentencing Guidelines and Policy Statements 18 (1987). The guidelines consider measurable aspects of economic crime, such as the amount of loss involved and the role of this defendant. These are practical metrics to be sure, but necessary ones to gauge the harm of various offenses. The loss from the defendant's fraud was approximately $600,597.00. This is a substantial amount of money - particularly so given the aggravating circumstances surrounding the defendant taking advantage of disaster-related benefits.

Benefit fraud committed by people like the defendant has cost the American taxpayer billions of dollars. As of June 2021, the Department of Labor (DOL), Office of Inspector General

(OIG) had identified nearly $8 billion in potentially fraudulent unemployment benefits paid from March 2020 through October 2020. *See* DOL, OIG, Report No. 19-21-005-03-315 (June 16, 2021). As of February 2022, DOL reported approximately $32.6 billion in UI overpayments from April 2020 through December 2021 (though not all of which may have been the result of fraud). *See* Government Accountability Office (GAO), Report GAO-22-105715 (March 17, 2022). These broader numbers provide important context for the defendant's conduct.

*Second,* the defendant's criminal history category understates her likelihood of recidivism and the economic danger she poses to the community. She has 11 convictions in the PSR, many of which are for very serious offenses such as obstruction of justice, unlawful wounding, obtaining money by false pretenses, financial card fraud, and failure to return rented property. (PSR ¶ 40-48.) Seven of the 11 convictions did not result in criminal history points, including her arguably most serious conviction for unlawful wounding. (PSR ¶ 41.) There are also recurring patterns of deceit and fraud across her convictions and arrests that suggest she has a long history of committing fraud and theft offenses.

*Third,* when the defendant was approached by federal agents, she was not honest. On September 6, 2023, agents from Department of Homeland Security (DHS) Office of Inspector General (OIG) and Department of Labor (DOL) Office of Inspector General (OIG) called the defendant and interviewed her by phone. She falsely denied every filing unemployment claims and falsely denied communicating with certain inmates. (Exhibit 1.) She said she would meet with agents on September 15, 2023, but never appeared for such a meeting. (Exhibit 2.) At the time of her arrest in 2024, the defendant was reinterviewed after being warned of her rights. She doubled down again. During recorded questioning, she falsely denied filing any unemployment claims for inmates and disputed even basic facts about recorded calls or messages presented to her.

*Fourth*, a sentence of 66 months would not result in unwanted disparity between the defendant and her coconspirator, Kendra Hatcher, who was sentenced to six months of incarceration. Hatcher had no criminal history (was a zero-point offender), had a master's degree, was working as a licensed therapist, and played a much less significant role in the conspiracy. Hatcher was only attributed with foreseeable fraud loss of approximately $63,296.00 and was only involved with four fraudulent claims. (*See* E.D. Va. Case No. 4:24-cr-54.) Hatcher also did not lie to investigators when she was first approached. In sum, the defendant's criminal record is wholly unlike Hatcher, she played a much more significant role in the crimes of conviction, and she made the matter worse when approached by law enforcement.

*Fifth*, the quantum of lies told by the defendant to accomplish the fraud at issue is troubling. The defendant and her coconspirators submitted scores of false applications for pandemic loan benefits. They did this time and again.

*Finally,* the Court should consider general and specific deterrence in fashioning a sentence for the defendant. The defendant is facing a period of incarceration that will hopefully be sufficient to specifically deter her. On this front, the public must have confidence that the activities of the defendant are treated with the utmost seriousness. The public must look at the actions of the defendant and know that benefit fraud at the expense of the rest of us will not be tolerated. Individuals inclined to consider committing crimes like those of the defendant must be made to pause in thinking about the consequences that follow.

Deterrence under Section 3553(a) is not limited to the necessary sentence to deter the defendant from engaging in further criminal conduct (specific deterrence), but also includes consideration of deterring other potential criminals from engaging in similar conduct (general deterrence). *United States v. Phinazee*, 515 F.3d 511, 515-16 (6th Cir. 2008) ("The plain language

9

of the statute . . . also militates against limiting the authority of the court to specific deterrence . . . . We note that this conclusion comports with the longstanding and uncontroversial practice of considering general deterrence in sentencing.") "Because economic and fraud-based crime are 'more rational, cool and calculated than sudden crimes of passion or opportunity' these crimes are 'prime candidates for general deterrence.'" *United States v. Martin*, 455 F.3d 1227, 1240 (11th Cir. 2006).

## CONCLUSION

The defendant is a repeat offender who engaged in hundreds of thousands of dollars of fraud. She took advantage of the community's good will during a national pandemic. This was egregious fraud that warrants a significant sentence of incarceration. For the foregoing reasons and others to be provided during the sentencing hearing, the United States respectfully requests a sentence of 66 months – an advisory guideline sentence that is sufficient but not greater than necessary to fulfill the statutory sentencing factors.

Respectfully submitted,

Lindsey Halligan
United States Attorney

By:         /s/
D. Mack Coleman
Assistant United States Attorney
Eastern District of Virginia
Newport News Division
11815 Fountain Way, Suite 200
Newport News, Virginia 23606
Tel. (757) 591-4000
Fax: (757) 591-0866
mack.coleman@usdoj.gov

CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 25th day of November 2025, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send an electronic notification of such filing to the following:

Sanita Anjannette Swift Sherard
205 South Battlefield Boulevard, Suite 100
Chesapeake, Virginia 23322

I HEREBY CERTIFY that on this 25th day of November 2025, I sent a true and correct copy of the foregoing to the following by electronic mail:

Jeffrey A. Noll
Senior U.S. Probation Officer
827 Diligence Drive, Suite 210
Newport News, VA 23606

                                                    /s/
                                        D. Mack Coleman
                                        Assistant United States Attorney
                                        Eastern District of Virginia
                                        Newport News Division
                                        11815 Fountain Way, Suite 200
                                        Newport News, Virginia 23606
                                        Tel. (757) 591-4000
                                        Fax: (757) 591-0866
                                        mack.coleman@usdoj.gov